9 A.3d 4

BAYLY CROSSING, LLC, et al.

v.

CONSUMER PROTECTION DIVISION, OFFICE
OF the ATTORNEY GENERAL.

No. 8, Sept. Term, 2010.

Court of Appeals of Maryland.

Nov. 22, 2010.

Mark F. Gabler (Rich and Henderson, P.C., Easton, MD), on brief, for petitioners.

Steven M. Sakamoto–Wengel, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, BARBERA, JOHN C. ELDRIDGE (Retired, Specially Assigned) and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

HARRELL, J.

On 19 November 2002, Julia B. Passyn, Theodore B. Passyn, and their son, Theodore B. Passyn, III ("the Passyns"), acquired Bayly Crossing, LLC ("Bayly"), with each taking a one-third interest. Bayly's main assets were thirty undeveloped, single-family residential lots in the eponymously-named Bayly Crossing subdivision in Dorchester County, Maryland. Bayly entered into contracts with various buyers to produce new homes on certain of these lots.

As Bayly was not a registered home builder in Maryland, the contracts specified that Bayly would subcontract with T.B. Passyn & Sons, Inc., a registered home builder in Maryland, to build the homes. This understanding was expressed in the written, essentially form contracts as follows: Bayly, as "SELLER," agreed to "sell and construct ... a house substantially similar to the seller's model...." [1] Bayly agreed, in a later provision, to "complete ... a dwelling substantially similar to SELLER'S Model House...." Near the end of the contracts, buyers acknowledged, by signature, that "On __ (date), my home builder, T.B. Passyn & Sons, Inc., MHBR

---

**1.** Although the lots subject to the various contracts were undeveloped apparently, at least one buyer, a Mr. Ritz, did a walk-through of a home before entering his contract with Bayly. The record does not establish where this home was located, who built it, or whether it was a model.

[Maryland Home Builder Registration] # 455 Provided me with a copy of [a] consumer information pamphlet. . . ."

In an addendum entitled "Builder's Notice of Standards and Buyer's General Release to Landowner[2] and Buyer's Acknowledgment of Receipt of Consumer Pamphlet Information," buyers were advised that "T.B. Passyn & Sons, Inc. MHBR 455 is the Builder for [their] house . . . and hereby agrees to grant to the Buyers of said house a One–Year Limited Warranty in accord with the Standards set by the Residential Warranty Corporation. . . ." "In exchange for [the] Limited Warranty," the addendum continues:

> [T]he Buyer's [sic] hereby grant a general release to Bayly Crossing, LLC ([the Passyns]) Landowners and their heirs, successors and assigns and forever discharge the said Bayly Crossing, LLC ([the Passyns]) from any and all actions or causes of action relating to the construction of the house on Lot ____ Phase ____ located at Bayly Crossing which Buyers have or may have against the said Bayly Crossing, LLC ([the Passyns]) now or in the future and also release the Builder from any and all items not covered either by said Limited Warranty or the Punch List. . . .

The contracts were executed by Julia B. Passyn, on behalf of Bayly, while the addendum was signed by a representative of T.B. Passyn & Sons, Inc.[3]

Between 19 November 2002 and 22 October 2004, seven homes were constructed on Bayly's lots. The purchase-price amounts in the contracts were paid to Bayly. On 22 October 2004, Bayly sold the remaining undeveloped twenty-three lots to an unrelated real estate development company.

On 12 July 2005, the Consumer Protection Division of the Attorney General's Office ("the Division") filed a Statement of

---

**2.** The contracts refer to Bayly as "seller" and "landowner" interchangeably.

**3.** Although not all of the contracts were identical in their terms, the differences are of no consequence to our analysis or conclusions regarding the questions presented in this case.

Charges against the Passyns and Bayly, alleging violations of Maryland's Home Builder Registration ("HBRA")[4] and Consumer Protection Acts ("CPA").[5] These alleged violations were based on the contention that Bayly was operating as a home builder, without properly registering with the State Home Builders Registration Unit ("HBRU").

Under the HBRA and CPA, the Division is authorized to bring charges and conduct civil administrative proceedings on those charges, acting as both prosecutor and administrative adjudicator. Pursuant to this power, the Division delegated to the Maryland Office of Administrative Hearings ("OAH"), an independent state agency, the obligation to conduct evidentiary hearings regarding the charges against Bayly and the Passyns and make recommended written findings of fact and conclusions of law. On 28 September 2005, an Administrative Law Judge ("ALJ") of the OAH, after holding hearings, issued a written Proposed Ruling, concluding that Bayly was exempt from the registration requirements of the HBRA. The ALJ reasoned that Bayly "f[ell] squarely within the [statutory] exception [for real estate developers who do not construct homes], and hence, outside of the registration requirement. . . ."

The Division filed exceptions to the ALJ's Proposed Ruling, effectively appealing administratively the ALJ's Proposed Ruling to the Division's adjudicative arm, which, for purposes of this opinion, we shall call "the Agency." The Agency granted those exceptions, concluding that Bayly, in fact, "was required to have registered as a home builder at the time that it

---

**4.** Maryland Code (2004 Repl.Vol. and 2007 Supp.), Business Regulation Article, § § 4.5–101 to 4.5–701. In 2008, the Legislature amended the HBRA, after the Division filed its Statement of Charges against Bayly and the Passyns. We shall not apply the substance of these post-filing amendments in deciding the questions presented here, as there is no indication that the Legislature intended them to have retrospective effect, and the Division does not argue that they do.

**5.** Md.Code (2005 Repl.Vol. and 2009 Supp.), Com. Law §§ 13–101 to 13–501.

entered into the contracts in which it undertook to construct new homes for consumers." The Agency then remanded the case to the OAH for "any further proceedings required to resolve factual or legal issues that have not been resolved by [this] ruling. . . ."

Before the remand hearing was held, the Division filed an Amended Statement of Charges against Bayly and the Passyns, alleging a violation of CPA § 13–301(13). Specifically, it claimed that Bayly and the Passyns engaged in an unfair or deceptive trade practice by asking in the contracts for the buyers to grant a general release, in exchange for a one-year home warranty. After a remand hearing, the ALJ issued a second Proposed Ruling, concluding that, as obliged by the Agency's earlier ruling, Bayly and the Passyns violated the "[HBRA] . . . by failing to register as a home builder under the [HBRA]" and "[CPA] § 13–301(13) by using a contract related to the sale of single family residential realty that contained a clause limiting or precluding the buyer's right to obtain consequential damages as a result of the seller's breach or cancellation of the contract." Bayly and the Passyns filed exceptions to the second Proposed Ruling. On 3 August 2007, the Agency issued a Final Order, upholding the ALJ's Second Proposed Ruling and imposing penalties and costs, on the Passyns and Bayly, for the violations.[6] In pertinent part, the Agency concluded that Bayly was a "home builder," within the meaning of the HBRA, because it undertook to build new homes—that is, it "placed upon itself the obligation to 'sell and construct' " new homes.

On 29 August 2007, Bayly and the Passyns filed, in the Circuit Court for Baltimore City, a petition for judicial review of the Final Order. The Circuit Court affirmed the Agency action, prompting an appeal to the Court of Special Appeals by Bayly and the Passyns. The intermediate appellate court

---

6. The Agency imposed fines of $25,000 on the Passyns and $6,781.98 on Bayly.

affirmed the Agency action, in a reported opinion, while dismissing Bayly "as a party to this appeal for lack of standing."[7] *Bayly Crossing, LLC v. Consumer Prot. Div., Office of the Attorney Gen.,* 188 Md.App. 299, 981 A.2d 777 (2009). A petition for certiorari to this Court ensued, which we granted, *Bayly Crossing v. Consumer Protection Division, Office of the Attorney General,* 412 Md. 255, 987 A.2d 16 (2010), to consider the following questions:

(1) Whether the lower court erred in affirming the decision of the Respondent finding that Petitioners were required to be registered as "home builders" in order to sell houses constructed by a registered home builder where the Home Building Registration Act excludes "developers who do not construct homes" from the requirement of registration?

(2) Whether the lower court erred in affirming the decision of the Respondent finding that Petitioners violated Section 13 –301(13) of the Consumer Protection Act by using a provision in their contract where buyers were given a one-year warranty in exchange for a release of construction-related causes of action?

Before oral argument the Passyns filed a motion, on 12 July 2010, to add Bayly as a petitioner and to supplement their brief. The inspiration for this appears to be *Price v. Upper Chesapeake Health Ventures,* 192 Md.App. 695, 995 A.2d 1054 (2010), decided by the intermediate appellate court after its opinion in *Bayly,* where the Court of Special Appeals revisited, clarified, and "affirmed" its earlier determination to dismiss Bayly as a petitioner. The Passyns sought the opportunity to respond to the discussion in *Price.* On 20 July 2010, that motion was granted.

---

**7.** Prior to filing the appeal, Bayly's corporate charter was forfeited in Maryland. The Court of Special Appeals reasoned that the forfeiture rendered Bayly ineffectual as a legal entity, and that, as a result, Bayly lacked standing to appeal. According to information supplied at oral argument, Bayly has not sought to revive its charter at any relevant time in these proceedings.

I.

*Relevant Standards of Judicial Review*

■ We "employ the same standards [of review] as would the circuit court, [for] the inquiry is not whether the circuit [or intermediate appellate] court erred, but rather whether the administrative agency erred." *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160, 874 A.2d 919, 939 (2005) (citation omitted). The standards for judicial review of the action of state administrative agencies are derived from the Maryland Administrative Procedure Act (APA), codified at Title 10 of the State Government Article ("SGA"). In reviewing an agency decision, a court may, under Section 10–222(h):

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

These provisions are instructive in understanding the applicable standards of review, as they lay out a basic analytical framework. *See Spencer v. Md. State Bd. of Pharm.*, 380 Md. 515, 528, 846 A.2d 341, 348 (2004) ("Section 10–222(h)(3)(i)–(vi) provides a statutory framework for understanding the scope of judicial review of agency decisions."). They do not provide, however, complete guidance, in and of themselves, how to approach each category of questions cognizable in a challenge to an agency decision. Appellate courts have devoted many pages to the consideration of the meaning (and implications) of

this subject. *See id.* ("Our jurisprudence has expanded on the meaning of these statutory provisions and provided guidance for their application by the courts.").

 We review challenges to an "agency's conclusions of law ... [according to a generally non-deferential standard] for correctness." *Schwartz v. Md. Dep't of Natural Res.,* 385 Md. 534, 554, 870 A.2d 168, 180 (2005); *Spencer,* 380 Md. at 528, 846 A.2d at 348–49. Interpreting the pure meaning of a statute is deemed a question of law. *See Miller v. Comptroller of Md.,* 398 Md. 272, 280–81, 920 A.2d 467, 472 (2007) ("[T]he question is one of statutory interpretation and [is], therefore, a purely legal inquiry.") (internal quotation marks and citations omitted); *State Dep't of Assessments & Taxation v. North Baltimore Ctr., Inc.,* 129 Md.App. 588, 595, 743 A.2d 759, 763 (2000) ("The interpretation of a statute normally presents a question of law.") (citations omitted). In considering such an agency decision, however, "[w]e frequently give weight to an agency's experience in interpretation of a statute that it administers." *Schwartz,* 385 Md. at 554, 870 A.2d at 180; *see also Board of Physician Quality Assur. v. Banks,* 354 Md. 59, 69, 729 A.2d 376, 381 (1999) ("Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency."). That is especially true (and justified) where the implicated statutory provisions are ambiguous or unclear. *Cf. Div. of Labor & Indus. v. Triangle Gen. Contrs., Inc.,* 366 Md. 407, 417, 784 A.2d 534, 539–40 (2001) ("[W]hen a statutory provision is entirely clear, with no ambiguity whatsoever, administrative constructions, no matter how well entrenched, are not given weight.") (internal quotation marks and citations omitted).

Defining the extent of that deference, however, remains an elusive snipe hunt. In *Baltimore Gas & Electric Co. v. Public Serv. Comm'n,* 305 Md. 145, 161–62, 501 A.2d 1307, 1315 (1986), we explained that the proper quantum of deference turns on various "considerations," including whether the agency (1) administers the statute it is interpreting, (2) developed its interpretation through a well-reasoned process, (3) in an

adversarial proceeding or formal rule promulgation, and (4) consistently applied that interpretation for a "long" period of time. Thus, the amount of deference may be seen to fluctuate with the number of "considerations" present in a given record.[8]

■ Maryland courts also recognize, and have for some time in Administrative Law matters particularly, the characterization of a "mixed question of law and fact." *See e.g., Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 837, 490 A.2d 1296, 1302 (1985). When a party challenges *how* an agency applied, as opposed to interpreted, a statute, he, she, or it raises a so-called mixed question. *See id.* ("The difference between the [parties'] position[s] . . . [are] based essentially on differing views—not as to the law governing the case—but rather its proper application to the established evidence of record. . . ."); *Charles County v. Vann,* 382 Md. 286, 296, 855 A.2d 313, 319 (2004) (defining mixed questions as those where "[t]he agency has correctly stated the law and its fact-finding is supported by the record, but the question is whether it has applied the law to the facts correctly"). The central dispute, therefore, involves not an interpretation, but "that last touch of selection" (or discretion), which the agency had to exercise to make the statute meaningful and determinative in a particular case. *FTC v. Ruberoid Co.,* 343 U.S. 470, 484–87, 72 S.Ct. 800, 808–10, 96 L.Ed. 1081, 1092–94 (1952) (Jackson, J., dissenting); *see also Consumer Prot. Div. v. Morgan,* 387 Md. 125, 874 A.2d 919 (2005) (construing the question presented as mixed because to calculate an appropriate fine amount the agency had to apply uncontested statutory factors to known facts). We review such mixed questions under the deferential "substantial evidence" standard. *See Baltimore Lutheran High School Assoc. v. Employment Sec. Admin.,* 302 Md. 649, 662, 490 A.2d 701, 708 (1985) (elucidat-

---

8. Some of these considerations may be implicit in a record, while others require the agency to produce evidence expressly to support the invocation of deference, *i.e.,* "well-reasoned process," consistent application, and length of application.

ing the "substantial evidence" standard as "such relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion"); *see also Vann*, 382 Md. at 298, 855 A.2d at 320 ("Deferential review over mixed questions of law and fact is appropriate in order for the agency to fulfill its mandate and exercise its expertise.").[9]

There is no dispute in the present case as to the material facts. Where there is such a dispute, we apply the very deferential "substantial evidence" test. *Christopher v. Montgomery County Dep't of Health and Human Servs.*, 381 Md. 188, 199, 849 A.2d 46, 52 (2004) (internal quotation marks and citation omitted).

## II.

### A. Bayly's Standing to File an Appeal

■ Before reaching the questions for which we issued the writ of certiorari, we consider briefly the "issue" of the standing of Bayly, as a defunct limited liability company (LLC), to participate as a petitioner in the Court of Special Appeals and here. The Court of Special Appeals noted that Bayly forfeited its charter before the appeal to that court was filed. *Bayly Crossing*, 188 Md.App. at 318, 981 A.2d at 788. As a result, it concluded that Bayly ceased to exist as a cognizable legal entity and, thus, lacked standing to appeal. *Bayly Crossing*, 188 Md.App. at 318–19, 981 A.2d at 788 (2009). Bayly was dismissed as a party. *See id.*

On 20 November 2009, the Passyns alone filed a petition for certiorari, asking us to consider the two questions noted *supra* at 135–36, 9 A.3d 4, 8, neither of which challenged Bayly's dismissal as a party. Thereafter, the Court of Special Ap-

---

9. There maybe be instances, however, where a party challenges the agency's application of a statute, but the statute is so clear and dispositive of the issue at hand that the agency's discretion is little implicated. *See Schwartz*, 385 Md. at 534, 870 A.2d at 181–82 (defining a mixed question as one whose "resolution requires not only factual findings ... but also [application] of the somewhat *ambiguous* statutory language in light of those facts") (emphasis added).

peals, collaterally and uniquely, revisited and commented on in *Price* its earlier decision to dismiss Bayly. It conceded in *Price*, a case unrelated to its decision in *Bayly* otherwise, that the statutes treat an LLC differently from a corporation, as regards their respective legal identity and status upon charter forfeiture, a distinction not addressed in its opinion in *Bayly*. While Section 3–503(d) of the Corporations and Associations Article of the Md.Code provides that, if a corporation fails to file an annual tax report, its charter is "repealed, annulled and forfeited," Section 4A–920 of the same Article states that an LLC remains in existence, even after charter forfeiture, but only for certain limited purposes, including (of argued relevance here) defending a law suit. Nonetheless, the intermediate appellate court "reaffirmed" in *Price* its decision in *Bayly* to dismiss Bayly, calling that decision not "erroneous" because, by filing an appeal to the Court of Special Appeals, Bayly was prosecuting, rather than defending, an action. *Price,* 192 Md.App. at 709, 995 A.2d at 1062.

On 20 July 2010, after *Price* was filed, Petitioners filed a motion with this Court to add Bayly as a petitioner and to supplement their brief to "address the Court of Special Appeal's analysis . . . in the [*Price* ] case." They made clear in the motion, however, that they were "not asking to add any other questions or issues for [our] consideration." We granted that motion, but improvidently, so we now find that, whatever the merits of their arguments, Petitioners did not preserve properly the issue for our consideration. Md. Rule. 8–131(b)(1). They did not pose in their petition for certiorari a question regarding Bayly's dismissal. Their subsequent motion did not seek to add a question in that regard. To permit Petitioners, by motion, to add a petitioner and argue the law regarding a question not raised in the petition for certiorari sanctions an end-around maneuver that we, albeit in hindsight, should not foster. We shall not consider further here the Court of Special Appeals's views on Bayly's (or any other defunct LLC's) ability to participate in an appeal as an LLC after its charter is forfeit. Our consideration of the actual questions presented is not hampered thereby because the

Passyns have standing to maintain the appeal in both appellate courts. *See Garner v. Archers Glen*, 405 Md. 43, 55, 949 A.2d 639, 646 (2008) ("[W]e ordinarily do not decide issues of standing where it is undisputed that one party on each side of the litigation has standing.").

B. The HBRA's Registration Requirements.

■ The parties, as well as the lower courts, frame the flagship issue as one of pure statutory interpretation, therefore, a pure question of law. The question, they assert, involves the interplay between the class of individuals and entities defined as "home builder[s]," by Section 4.5–101(f)(1) of the HBRA, and therefore required to register with the State, and those excluded expressly from the registration requirement by Section 4.5–101(g)(3)(iv) as "real estate developers" who do not construct homes. The Division argues that the term "home builder," defined in the statute as one who "undertakes to erect or otherwise construct a new home," should include those who appear to contract to build new homes, but who, in fact, do not. Relying upon Section 4.5–101(g)(3)(iv), which exempts from registration "real estate developer[s] who do[ ] not construct homes," the Passyns argue that the HBRA applies only to those who actually construct new homes.[10] Thus, the parties center their arguments on the statutory scheme, believing it to control the outcome of this case.

At first blush, this appears to generate a question of statutory interpretation. Upon closer reflection, however, we observe that the heart of this dispute rests not with the meaning of the terms "home builder" or even "real estate developer," as used in the HBRA, but with the way the Division applied those terms to a less than inclusive consideration of all of the relevant and material undisputed facts of the case. As in *Vann*, not only are the material facts undisputed, the parties rely correctly on the basic governing statute, without real quarrel as to its meaning. They agree that the HBRA

10. The HBRA does not define the term "real estate developer."

requires those who undertake to construct new homes to register as "home builder[s]." The parties only reach an impasse regarding the exclusion of real estate developers because the Division presumes, as a matter of *contract construction*, that Bayly, in fact, "undertook" to construct new homes. A complete reading of the relevant portions of the contracts, as demanded by the principles of contract interpretation, undermines this presumption. Thus, it seems that a mixed question of law and fact looms, rather than a pure legal question.

In applying the HBRA (and the principles of contract interpretation) to the facts, the Division reads selectively the contracts, ignoring the direction that " 'in ascertaining [its] true meaning . . . the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that . . . an interpretation . . . [does not] cast[ ] out or disregard[ ] a meaningful part of the language of the writing. . . .' " *Cochran v. Norkunas,* 398 Md. 1, 17–18, 919 A.2d 700, 710 (2007) (quoting *Sagner v. Glenangus Farms,* 234 Md. 156, 167, 198 A.2d 277, 283 (1964)).[11] In concluding that Bayly undertook to "erect or otherwise construct a new home," the Division relied upon contractual provisions where it seemed that Bayly agreed to "sell and construct," as well as "complete" new homes. When the sections that the Division highlights in its final decision are read in isolation, the contracts might appear to constitute an undertaking, on the part of Bayly, to construct new homes.[12] When the contracts are read in their entirety, however, it is clear that the contracts

---

11. For example, while cross-examining Julia B. Passyn before the ALJ, the Division emphasized one contractual provision regarding the "SELLER agrees to sell and construct." Based of this language, the Division asserted that "Bayly Crossing . . . agree[d] to construct the home." In response, Ms. Passyn observed that the Division is "piece-mealing the contract . . . You're asking me to act like that's the only part of the contract that's relevant."

12. To be sure, Bayly courted at least some of the Division's views in this regard by using essentially form builder contracts for which little adjustment of inconsistent boilerplate was made to reflect the actual structure of the developer/builder dichotomy in these transactions.

specified who, exactly, was going to be performing the actual construction of the new homes—T.B. Passyns & Sons, Inc., a registered home builder in Maryland. Indeed, the buyers were not only required to acknowledge, by executing the contracts, that T.B. Passyn & Sons, Inc. is "my home builder," but they were advised once more, in an addendum, that "T.B. Passyn & Sons, Inc. MHBR 455 is the Builder of [their] house . . . ."

Un-mistakenly, the buyers were on notice of the identity of their registered home builder. The Division appears to have ignored this, thus rendering these material clauses nugatory, in violation of basic contract interpretation principles. Moreover, the Division offered no rationale for why the structure of the contractual arrangement presented hidden dangers for consumers, a matter that might have implicated agency expertise. As a result, we hold that the Division's presumption that Bayly held itself out as a home builder, within the meaning of the HBRA, is unsupported by competent, material, and substantial evidence in light of the entire record as submitted. Accordingly, the Division's determination of a violation by Bayly regarding the HBRA's registration requirement (and concomitant related CPA provisions) cannot stand.

### C. The General Releases and the CPA

The final question we consider is whether Bayly and the Passyns, under the circumstances, violated the CPA by requiring buyers to grant a general release. Section 13–301(13) of the CPA provides that no "seller . . . of consumer realty [may use] . . . a clause limiting or precluding the buyer's right to obtain consequential damages as a result of the seller's breach or cancellation of the contract." Com. Law § 13–301(13). The contracts in this case provided that, in exchange for a limited warranty, buyers were to grant

a general release to Bayly Crossing, LLC ( [the Passyns] ) Landowners and their heirs, successors and assigns and forever discharge the said Bayly Crossing, LLC ( [the Passyns] ) from any and all actions or causes of action relating to the construction of the house on Lot ___ Phase ___

located at Bayly Crossing which Buyers have or may have against the said Bayly Crossing, LLC ( [the Passyns] ) now or in the future and also release the Builder from any and all items not covered either by said Limited Warranty or the Punch List. . . .

The Division argues that general releases, which preclude a buyer from obtaining any kind of resultant damages, necessarily preclude a buyer from obtaining consequential damages, in violation of the CPA. The Passyns retort that the general releases "sa[id] nothing about consequential damages," meaning they did not preclude or limit, in any way, a buyer's right to consequential damages. Although the phrase "any and all actions or causes of action" is broad in scope, they rely upon the qualifying phrase "relating to the construction of the house[s]" to suggest that buyers waived only causes of action arising after contract-performance. As the CPA concerns only those causes of action arising during contract-performance, or so Petitioners claim, the post-performance general releases did not violate it.

Unlike the HBRA issue, we perceive that the dispute here focuses on the meaning and coverage of the statute. Stated another way, the nature of our inquiry (and its ultimate resolution) are not fact-dependent, and, therefore, we are presented with a question of law. *See Vann,* 382 Md. at 299, 855 A.2d at 321 (describing mixed question as "fact-dependent . . . inquiries," which "cannot be adjudicated without considering the law in view of the applicable facts"). Sometimes, even with regard to resolving legal questions, as we noted *supra,* agencies are accorded a degree of deference. Due to the clarity and specificity of this statutory provision, however, we conclude that the Legislature did not entrust much to the Division's expertise and decision-making respecting general releases. *See Triangle Gen. Contrs., Inc.,* 366 Md. at 417, 784 A.2d at 539–40.

On the basis of the plain meaning of the CPA, the Legislature intended to proscribe the use of general releases, by a seller of consumer realty, which do not preserve specially a

buyer's right to obtain consequential damages. A seller of consumer realty need not address expressly in its waiver consequential damages; that *all* claims for damages were precluded, however, is violative of the CPA. Thus, we do not consider persuasive Petitioners' argument that its general releases did not offend the CPA because they "sa[id] nothing about consequential damages" and were targeted at only post-construction claims. We find the language of the releases sufficiently expansive to fall within the clear and unambiguous regulatory prohibition of the CPA.[13] Consequently, we affirm the Court of Special Appeals's holding that the Division's subsequent determination regarding Petitioners' general release violated CPA § 13–301(13).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT FOR FURTHER REMAND TO RESPONDENT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE SHARED EQUALLY BY PETITIONERS (50%) AND RESPONDENT (50%).**

---

**13.** Although Bayly did not contract to build homes for purposes of the HBRA's registration requirement, there might be claims under the contract relating to the construction process (and result) for which Bayly might be liable nonetheless.